IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LEROY G. INSKEEP, as Trustee for GRIFFIN TRADING COMPANY, INC., | ) ) ) | |
| Plaintiff/Appellee, | ) ) | Case No. 05 C 1834 |
| v. | ) ) | Hon. Mark Filip |
| FARREL J. GRIFFIN and ROGER S. GRIFFIN, | ) ) ) | |
| Defendants/Appellants. | ) | |

**MEMORANDUM OPINION AND ORDER
VACATING THE JUDGMENT OF THE BANKRUPTCY COURT
AND REMANDING THE CASE FOR FURTHER PROCEEDINGS**

After Griffin Trading Company filed for Chapter 7 bankruptcy, the bankruptcy trustee (also, "Trustee") brought an adversary complaint against Defendants-Appellants, Farrel and Roger Griffin (also, "Defendants"), the directors and sole shareholders of Griffin Trading. The complaint alleged that Defendants breached their duty of care to creditors, and the bankruptcy court agreed, concluding that Defendants were grossly negligent in failing to stop a wire transfer of customer funds to a third party. The bankruptcy court entered judgment for the bankruptcy trustee, and Defendants appeal the judgment and award of damages. For the reasons explained herein, the Court vacates the judgment of the bankruptcy court and remands for further proceedings or explication on the issue of liability.

FACTS

Defendants Farrel Griffin and Roger Griffin were directors and sole shareholders of Griffin Trading Company. (J.A. 4, Stip. ¶ 8.) Griffin Trading was a futures commission

merchant, that is, a broker for those who trade commodities futures. (*Id.* ¶ 1; J.A. 44, Trial Tr. at 49-50.) The company was headquartered in Chicago, with an additional office in London. (J.A. 4, Stip. ¶ 2.)

Parties trade commodities futures by forming a contract to buy or sell a commodity on a future date, at a price the parties agree upon at the time they make the contract. (*Id.* ¶ 3.) Traders act through brokers who are members of a commodities exchange. (J.A. 44, Trial Tr. at 49.) When a trader places an order to make a trade, his or her broker executes the trade by forming a contract with another broker. (*Id.* at 49-50.) The buying broker and selling broker then "clear" the trade by submitting details of the trade to the exchange's clearing house. (*Id.* at 58-59.) Only a clearing member of an exchange may submit trades for clearing to that exchange's clearing house. (J.A. 4, Stip. ¶¶ 4, 6.) If a customer's broker is not a clearing member of an exchange, the broker must submit its customer's trades through a clearing member or broker. (*Id.*)

The members who clear a trade are the actual parties to the contract and bear principal financial responsibility for the trade. (J.A. 43, O'Connell Aff. ¶ 31.) Trading thus creates a chain of liability, with clearing members recovering any losses by collecting from the non-clearing brokers or the customers on whose behalf the clearing members made the trade. (J.A. 4, Stip. ¶¶ 4, 6; J.A. 43, O'Connell Aff. ¶ 41.) To ensure payment, exchanges require clearing members to deposit funds, which are called the "margin." (J.A. 43, O'Connell Aff. ¶¶ 33-35.) In turn, brokers require their customers to maintain margin funds in customer trading accounts held by the brokers. (J.A. 4, Stip. ¶¶ 4, 12; J.A. 44, Trial Tr. at 54-56.) Both British and American law require brokers to hold their customers' margin deposits in a segregated client account, separate from the broker's "house" account. (7 U.S.C. § 6d(a)(2); J.A. 43, O'Connell

Aff. ¶ 42.)  Approximately one week before the events at issue in this case, Griffin Trading received a report informing it that its segregated client account was "extremely low."  (J.A. 45, 1/26/05 Ruling Tr. at 4.)

On December 21-22, 1998, John Ho Park, a customer in Griffin Trading's London office, substantially exceeded his trading limits and suffered losses that eventually bankrupted Griffin Trading.  (J.A. 43, O'Connell Aff. ¶ 47.)  Park traded bonds on the German futures exchange, EUREX.  (J.A. 4, Stip. ¶ 11.)  Because Griffin Trading was not a clearing member of EUREX, it used a clearing member, MeesPierson N.V., as its clearing broker.  (*Id.* ¶ 6.)  Thus, EUREX looked to MeesPierson to cover any losses, MeesPierson looked to Griffin Trading, and Griffin Trading looked to Park.  (*Id.*)  At the time of the trades, Park had approximately $1.56 million in his margin account with Griffin Trading.  (*Id.* ¶ 12.)

Park's losses began on December 21, and he continued to suffer losses when the market shifted against him overnight.  (J.A. 43, O'Connell Aff. ¶¶ 47-49; *see also* J.A. 42, CFTC Order at 7.)  Personnel at Griffin Trading's London office first became aware of Park's losses on the morning of December 22, but they were unaware of their full extent, and Griffin Trading allowed Park to continue to trade that morning and to incur more losses.  (J.A. 43, O'Connell Aff. ¶¶ 51, 54; J.A. 42, CFTC Order at 7.)  Sometime after 9:30 a.m. London time on December 22, MeesPierson issued a margin call instructing Griffin Trading to transfer five million Deutsche Marks ("DM") (over $2.9 million) to MeesPierson's bank in Germany to cover Park's known losses up to that point.  (J.A. 21; J.A. 43, O'Connell Aff. ¶¶ 50-51; D.E. 14 at 13 n.3.)  According to banking conventions, this payment was due on December 23.  (J.A. 21; J.A. 43, O'Connell Aff. ¶ 50.)

At 11:19 a.m. GMT on December 22, Griffin Trading's London office initiated a wire

transfer in response to MeesPierson's margin call, which in turn thereafter triggered a series of related wire transfers to effect the funds transfer. (J.A. 43, O'Connell Aff. ¶ 50.) First, Griffin Trading transferred £ 1.6 million from its account at the London Clearing House to its account at the Bank of Montreal. (*Id.*) The funds were then immediately transferred to Griffin Trading's account at another bank, Credit Lyonnais Rouse Limited. (*Id.*) The next day, December 23, at 11:51 a.m. GMT, the funds were converted into DM 5 million and sent back to the Bank of Montreal. (*Id.*) At 11:52 a.m. GMT, the funds were transferred to MeesPierson's bank in Germany. (*Id.*)

Defendants entered the picture shortly after Griffin Trading's London office initiated the funds transfer on the morning of December 22. The initial wire transfer was made at 11:19 a.m. London time, and Farrel Griffin arrived for work in the Chicago office a short time later, between 12 and 1 p.m. (6-7 a.m. Chicago time). (J.A. 45, 1/26/05 Ruling Tr. at 6.) Defendant Roger Griffin was on vacation in Florida, but he spoke to Farrel Griffin on a conference call throughout the day and was equally responsible for the decisions that followed. (*Id.*) When Farrel Griffin learned about Park's losses, he took a number of steps, including contacting his counsel, contacting the Chicago Board of Trade's Office of Investigation and Audit, stopping all trades by Park, and instructing the London office to transfer other customers' funds to other brokers in Chicago and London. (J.A. 44, Trial Tr. at 149-51.) However, Farrel Griffin stated that he did not know about MeesPierson's DM 5 million margin call made the morning of December 22. (*Id.* at 131.) He and Roger Griffin further testified that they did not ask their employees or their banks whether there had been any margin calls or wire transfers, and did not instruct anyone to stop any such transfers. (*Id.* at 131, 137, 170, 217.)

As the day wore on, it became clear that Park's losses were far greater than Griffin

Trading had first imagined. (J.A. 43, O'Connell Aff. ¶¶ 51, 54; J.A. 42, CFTC Order at 7.) Eventually, it became clear that Park's losses had destroyed Griffin Trading.

On December 30, 1998, Griffin Trading filed a Chapter 7 bankruptcy petition and Leroy G. Inskeep was appointed as the Chapter 7 Trustee. (J.A. 4, Stip. ¶ 15.) The Trustee filed a five-count adversary complaint against the Griffins and their wives. (J.A. 1.) At issue in this appeal is Count IV, which alleged that Defendants breached their fiduciary duties to creditors by, among other things, transferring some $2.6 million of customer funds to MeesPierson. (*Id.* at 5-6.) Before trial, the bankruptcy court entered partial summary judgment on Count IV; the bankruptcy court found that during the relevant period Griffin Trading was insolvent, and that Defendants therefore owed a fiduciary duty to Griffin Trading's creditors, including its customers. (J.A. 3 at 11.)

After a bench trial on the extant issues, the bankruptcy court issued an oral opinion in favor of the Trustee. (J.A. 45, 1/26/05 Ruling Tr.) The court rejected Defendants' testimony that they did not know about the margin call or wire transfer, stating that such claims "ring[] completely hollow." (*Id.* at 8.) The bankruptcy court found that Defendants did not know about the wire transfer before the London office initiated it on December 22 and that there was no gross negligence—the liability standard at play—before December 22. (*Id.* at 3, 5.) But the court found that Defendants did know about the funds transfer it before it was completed on December 23, and while there was still time to stop it. (*Id.* at 9-10.) The court found that Defendants had a "clear duty . . . to take steps to stop the payment before their bank executed the transfer" because it was "clear that the transferred funds came from monies held by the company on behalf of other customers. . . ." (*Id.* at 9.) The bankruptcy court stated that "defendants' failure to discover and stop the wire transfer paying the margin call constituted gross negligence

-5-

and constituted a violation of their fiduciary duties to their creditors; that is, to their customers." (*Id.* at 10.)

The bankruptcy court entered judgment in favor of the Trustee in the amount of the wire transfer, $2,985,074.63, plus prejudgment interest, for a total of $4,690,071.99, plus costs. (J.A. 8.) Defendants filed a motion to alter or amend the judgment under Fed. R. Bankr. P. 9023 and Fed. R. Civ. P. 59, (J.A. 9), which the bankruptcy court denied. (J.A. 12.) Defendants now appeal the bankruptcy court's judgment and the order denying the motion to amend. (J.A. 13.) Defendants make three arguments: (1) the Trustee failed to prove causation because he failed to carry his burden of showing that it was possible for Defendants to stop the wire transfer(s) after they learned of them; (2) even if Defendants could have stopped the wire transfer(s), their failure to do so was not gross negligence; and (3) even if it was gross negligence, the bankruptcy court's award of damages was too high. The Court vacates the judgment of the bankruptcy court and remands on the first issue. Given the uncertainty concerning the first issue, the Court does not reach issues two and three, and expresses no opinion about them.

LEGAL STANDARD

Rule 8013 of the Federal Rules of Bankruptcy Procedure states that in the course of the district court's appellate review of a bankruptcy court order, "[f]indings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013; *accord Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004). Seventh Circuit precedent instructs that "a bankruptcy court's factual findings cannot be disturbed 'simply because the district court is convinced it would have decided the case differently.'" *Mungo*, 355 F.3d at 974 (quoting *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989)) (further internal punctuation and citation omitted).

On the other hand, the district court reviews questions of law and mixed questions of law and fact *de novo*. *Id.* (citing *In re Ebbler Furniture & Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir. 1986)).[1]

DISCUSSION

1.    Introduction

Defendants make a threshold argument that the Trustee failed to prove the causation element of liability because he failed to prove it was possible for Defendants to stop the funds transfer. (D.E. 13 at 10-12.) If stopping the funds transfer was impossible (or at least not adequately shown by the Trustee to be possible), Defendants claim, then Defendants could not have been grossly negligent for failing to stop the funds transfer after they learned of it.

The bankruptcy court's ruling on this point is terse. Although this Court fully appreciates why the bankruptcy court issued an oral ruling, the unfortunate reality is that the basis for the bankruptcy court's ruling, as evaluated against the issues raised on appeal—including, in particular, the causation issue and related sub-issues—is not clear. *See generally Travelers Cas. & Sur. Co. of Am. v. Wells Fargo Bank N.A.*, 374 F.3d 521, 524 (7th Cir. 2004) (admonishing trial courts, in a commercial suit involving a U.C.C. issue, to "beware [of] oral opinions in [such]

---

[1]  The parties disagree somewhat concerning the applicable legal standard—with the Trustee, for example, arguing that whether the Trustee proved causation and gross negligence are factual determinations that are subject to the clearly erroneous standard, as opposed to mixed questions evaluated under the *de novo* standard. Because the basis for the bankruptcy court's oral ruling on the causation issue is, with all respect, opaque in key respects, the propriety of a remand is not affected by the particular standard and the result in this Court would be the same either way at this stage. Although, as explained further below, the terse nature of the oral ruling, as compared with the issues raised on appeal, appears potentially to be the product of the parties' unfocused and/or belated treatment of the issues in the bankruptcy court, the unfortunate reality is that the bases for the oral ruling, as compared to the issues on appeal concerning causation, are unclear. As such, a remand is needed, as explained below.

complex cases," and reversing and remanding case for further proceedings in the trial court). To give the case fair treatment on appeal—and to give the trial judge's views and evidentiary assessments appropriate respect and consideration—requires a remand for further proceedings before the bankruptcy court. *See id.*, 374 F.3d at 529 (remanding case and leaving to the trial court's informed discretion whether further proceedings would involve evidentiary ones).

By way of background, with respect to the causation issue, the bankruptcy court stated that "the law allowed the defendants to abort the wire transfer up until the time that the money was actually transferred. Section 5/4 A-211(b) of the Uniform Commercial Code provides the operative rule of law." (J.A. 45, 1/26/05 Ruling Tr. at 10.) The oral ruling does not address any of the complicated issues presented under the applicable and various provisions of the U.C.C. (as discussed further below)—which to be fair to the bankruptcy court, appears to be substantially the fault of the parties, as the Trustee seemingly only flagged the U.C.C. as relevant at the reply-brief stage of the post-trial briefing. (J.A. 7 at 5.) That was unfortunate, with all respect, on the part of the Trustee, but it is a foundational basis for the bankruptcy court's oral ruling, and thus must be evaluated on those terms. Furthermore, with respect to analysis potentially reflecting application of the U.C.C. (including, in particular, U.C.C. Section 5/4A-211(b), as well as other potentially relevant sections), the oral ruling simply states: "I do not believe that the evidence proves that the defendants knew that the five million Deutsche mark wire transferred in advance of the order for that [which] was placed by Mr. Rose in the London office, but I do find that the evidence provides that they knew about it while there was still time to stop it." (J.A. 45, 1/26/05 Ruling Tr. at 9.) This statement does not illuminate the bases of the ruling, as against the evidence in the record, and thus requires further explication.

For the reasons stated below, the Court respectfully vacates the judgment of the

bankruptcy court and remands for further explication and/or proceedings, so as to resolve (or perhaps just clarify or more directly address) the issues identified herein. Although this Court has attempted on multiple occasions to attempt to fairly digest the trial record so as to definitely rule on the issues presented, doing so, with all respect, does not appear to be the fairest course with respect to the parties or the bankruptcy court. It is unclear what evidence the bankruptcy court credited, and attempting to review the full evidentiary record so as to adduce the correct result is a task for which an appellate court is not best positioned to get right, at least as compared to the bankruptcy court that lived with the case and heard the witnesses. As a result, the case is remanded. *See Travelers Cas. & Sur. Co.*, 374 F.3d at 529.

      2.      Defendants Waived Choice of Law Arguments Relating To The Funds Transfer

Defendants argue that the bankruptcy court erred as a matter of law by applying the Illinois U.C.C. to the funds transfer. (*See* D.E. 13 at 10.) Defendants assert that because the wire transfer was the product of "a series of four transfers between Griffin Trading's banks in England to MeesPierson's bank in Germany," the law of either England or Germany would govern the question of whether or not the funds transfer could have been reversed. (*See id.* at 11-12.) In response, the Trustee argues, *inter alia*, that Defendants have waived any argument that they might have had relating to the bankruptcy court's decision to apply Illinois U.C.C. law to the funds transfer. (*See* D.E. 14 at 25-29.) The Court agrees with the Trustee that the question of choice of law has been waived, and therefore declines to consider the issue on appeal.

Well-established precedent instructs that a litigant may not make an argument for the first time on appeal. *See*, *e.g.*, *Prymer v. Ogden*, 29 F.3d 1208, 1215 (7th Cir. 1994) (citing *Ohio Cas. Ins. Co. v. Rynearson*, 507 F.2d 573, 582 (7th Cir. 1974), for the proposition that "[t]he

principle that new issues or new bases of liability may not be raised for the first time on appeal is too well known to require citation."). The two-fold rationale for this rule is clear—first, litigants who raise new issues on appeal fail to give notice to the opposing party of the issue and so prevent them from fully developing the record below, *see, e.g., Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 221 (7th Cir. 1996) (collecting cases), and second, those litigants deprive the trial court of the opportunity to address the issue in the first instance. *See, e.g., United States v. Andreas*, 150 F.3d 766, 769-70 (7th Cir. 1998) (per curiam) (collecting cases).

Raising a new issue on appeal becomes even more problematic where, as here, the new issue involves a question of foreign law. This implicates Federal Rule of Civil Procedure 44.1, which is made applicable by Federal Rule of Bankruptcy Procedure 9017, and which states that "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading" or by other reasonable written notice. Fed. R. Civ. P. 44.1; *accord, e.g., Whirlpool Fin. Corp.*, 96 F.3d at 221 (stating that under Fed. R. Civ. P. 44.1, the appellant contending that the district court erred in applying Illinois law, as opposed to Venezuelan law, "had the obligation to provide the district court with 'reasonable notice' of his intention to raise an issue of foreign law" in the trial court). Caselaw reflects that a failure to fulfill Fed. R. Civ. P. 44.1's requirement of reasonable written notice results in waiver of the appellant's ability later to raise an issue of foreign law. *See, e.g., Whirlpool Fin. Corp.*, 96 F.3d at 221 (finding that the issue of whether foreign law applied was waived because the defendant-appellant "made no effort to argue from Venezuelan law until after summary judgment had been rendered against him."); *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995) (declining to consider plaintiff's argument that German law should be considered, "[c]ritical as the argument is," because "the only method by which the plaintiffs tried to bring to the district court's (or our) attention the

German law . . . was by submitting to the district court an affidavit of German law after that court had dismissed the suit . . . .") (emphasis omitted); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208-09 (2d Cir. 2003) (per curiam) (citing Fed. R. Civ. P. 44.1 and declining to consider documentary evidence relating to Korean law submitted for the first time on appeal).

In the present matter, the Trustee first argues that Defendants waived the argument that English or German law should apply to the funds transfer by failing to raise it in the Joint Pre-Trial Statement filed with the bankruptcy court. (*See* D.E. 14 at 25 (referring to J.A. 4).) However, the Court does not believe that Defendants waived the choice of law argument at that point in the proceedings. The Trustee's account of the theory of Count IV in the Pre-Trial Statement did not list the failure to reverse the funds transfer among the actions allegedly constituting a breach of fiduciary duty on the part of Defendants. (*See* J.A. 4 at 3.) So, it is understandable that the Defendants' Pre-Trial Statement did not assert the impossibility of reversing the funds transfer as a defense or the potential applicability of foreign law as to that issue. (*See id.* at 5-6.)

However, the Court concludes that Defendants' subsequent omissions resulted in waiver, because Defendants should have notified the bankruptcy court of their intent to raise choice of law arguments prior to the issuance of the bankruptcy court's judgment under review. Defendants argue that the Trustee only asserted that Illinois law applied to the funds transfer in his Post-Trial Reply Brief (*see* J.A. 7 at 5), and so "[n]ot anticipating the trustee's new argument could not be a waiver." (D.E. 20 at 16.) However, the issue of whether the funds transfer could be stopped or reversed was clearly raised at trial, and the Court believes that the Defendants would have been well aware that the issue could be relevant to the Trustee's claim of breach of

fiduciary duty. The trial transcript reflects that the Trustee raised the issue of Defendants' failure to stop or reverse the funds transfer multiple times, including one reference in the Trustee's opening statement: "[n]ow, on December 22nd of 1998, Griffin Trading Company instructs its bank to wire transfer the 5 million Deutsche Marks, or the $2.9 million, from its account. This money doesn't get sent until the next day, so there is a 24-hour time period where somebody could have stopped that wire transfer." (J.A. 44, Trial Tr. at 16; *see also*, *e.g.*, *id*. at 129-131.)

Following the trial, Defendants' recognition of the relevance of the possibility of reversing the funds transfer is reflected in their Post-Trial Response Brief. (*See* J.A. 6 (raising the issue at 1, 4 n.1, 25, 26, 27).) In that brief, Defendants elected to focus on how the Trustee had "presented zero evidence" that the Defendants could have reversed the funds transfer; however, Defendants did not provide the bankruptcy court with any legal standard, much less a foreign legal standard presented in conformity with Fed. R. Civ. P. 44.1, against which to measure the Trustee's evidence. In the absence of choice of law arguments by the parties, Defendants might have anticipated that precedent and common sense would lead the bankruptcy court to apply the law of the forum (here, Illinois), to any dispute regarding the funds transfer. *See*, *e.g.*, *ECHO, Inc. v. Whitson Co.*, 52 F.3d 702, 707 (7th Cir. 1995) ("Where neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.") (citing *Checkers, Simon & Rosner v. Lurie Corp.*, 864 F.2d 1338, 1345 (7th Cir. 1988)).

Even if the Court accepts *arguendo* Defendants' argument that they were not required to anticipate the Trustee's assertion of Illinois law in his Post-Trial Reply Brief, the Court finds that Defendants still have waived their right to raise choice of law questions on appeal. In this

regard, the Trustee filed his Post-Trial Reply Brief (*see* J.A. 7), and then nearly two months

elapsed before the bankruptcy court issued its judgment. (J.A. 45, 1/26/05 Ruling Tr.) At no

point during that two-month period did Defendants file a motion or a Fed. R. Civ. P. 44.1 notice

with the bankruptcy court to request additional briefing on what law should apply to the funds

transfer, nor did Defendants request to submit supplemental materials such as affidavits from

experts in English or German law.

Because Defendants failed to raise the issue of choice of law for the funds transfer at

trial, in the post-trial briefing, and in the two months between briefing and judgment, Defendants

have waived this issue on appeal. *See Frietsch*, 56 F.3d at 828; *In re Magnetic Audiotape*

*Antitrust Litig.*, 334 F.3d at 209 (barring on appeal defendant's arguments based on Korean law

and noting a three month span of time where the defendant could have raised its foreign law

arguments before the district court).[2]

---

[2] In their reply brief on appeal, Defendants assert that applying Illinois law as the default law (*i.e.*, where no choice of law argument had been properly raised by them concerning foreign law or the law of another state) was inappropriate because the "case law holds that in the special context of diversity cases, the district court should apply the law of the forum state if the parties do not raise the choice of law issue or if there is no difference between the two jurisdictions. This rule does not apply to a non-diversity case . . . ." (D.E. 20 at 7 (further footnote omitted).) Defendants cite no authority in support of their assertion that the rule that a trial court may properly apply its own forum law, in the absence of an argument to the contrary, is limited to diversity cases only. The Court has conducted its own research, and precedent certainly reflects that the rule applies when the choice of law involves the forum law of Illinois, on the one hand, and the unraised possibility of foreign law, on the other. *See Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 221 (7th Cir. 1996) (finding that appellant had waived issue about potential applicability of Venezuelan law, instead of Illinois law, by failing to properly raise it). In addition, precedent teaches that choice of law arguments are waivable, which is what occurred here in the trial court. *See, e.g.*, *Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir.1995) (teaching that "choice of law, not being jurisdictional, is normally . . . waivable") (collecting cases). That same precedent further reflects that the waiver rule concerning choice of law issues applies as to both federal and state law options, and, significantly, that the waiver rule applies in the setting of a non-diversity suit as well. *Id.* (applying rule in appeal of a federal Section 1983 suit). In summary, Defendants' suggestion that the waiver analysis only applies in diversity

3.      Nonetheless, It Is Unclear Whether the Judgment Is Correct When Illinois U.C.C. Rules Are Applied

Defendants argue that even if Illinois U.C.C. law is applied to the question of whether the Defendants could have cancelled the funds transfer, the Trustee failed to meet his burden of proof under Article 4A of the Illinois U.C.C. (*See* D.E. 13 at 12.) Because it is unclear whether the bankruptcy court reached the correct result under the applicable U.C.C. rules on the record assembled, the Court vacates and remands.

a.      Introductory Legal Framework

The tort at issue at the trial was breach of fiduciary duty—*see* J.A. 4, Joint Pre-Trial Statement at 2—which entailed an analysis of alleged gross negligence by Defendants and its impact in the commercial setting under review. Defendants argue without contradiction on appeal that liability under such a tort regime at a minimum requires the plaintiff alleging harm to establish, as an element of plaintiff's case, causation—*i.e.*, that the breach of the duty of care caused damages. (D.E. 20 at 4 (citing, *inter alia*, Delaware and Illinois caselaw, as well as Prosser & Keeton, *The Law of Torts* § 30 (5th ed. 1984)).) The parties also seem to have accepted this basic proposition in the bankruptcy court. (*See* J.A. 4, Joint Pre-Trial Statement at 2 (stating that, "[t]o prevail . . . the Trustee must prove . . . [*inter alia*] . . . "that such breach proximately caused the damage of which the Trustee complains.").) As a result, the parties

_____

cases appears inconsistent with appellate decisions in this area of law—and, again, Defendants offer no authority for their contention that the rule is as they claim. Judges are not required to attempt to find authority in support of a party's undeveloped argument—*see*, *e.g.*, *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir.2004) (teaching that cursory and undeveloped arguments are waived); *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 551 (7th Cir.2004) (similar)—and the Court respectfully declines to do so here. The Court considers this contention waived as insufficiently developed and, independently, as meritless based on the authorities cited above in this footnote.

appear to be in agreement, as they were in the bankruptcy court, that if the funds transfer at issue

was irrevocable at the point in time that Defendants became aware of the transfer, then no

liability could attach based on their subsequent failure to reverse the (then-irreversible) transfer

that had already been initiated.

        b.      Relevant Provisions Of Article 4A Of The Illinois U.C.C.

The bankruptcy court expressly indicated that it was relying on Section 5/4A-211(b) of

the Illinois U.C.C. in reaching its conclusion that "the law allowed the defendants to abort the

wire transfer up until the time that the money actually transferred." (J.A. 45, 1/26/05 Ruling Tr.

at 10.) As stated, this was a foundational basis of the bankruptcy court's ruling. Section 5/4A-

211 provides that:

> (b) . . . a communication by the sender cancelling or amending a payment order is
> effective to cancel or amend the order if notice of the communication is received
> at a time and in a manner affording the receiving bank a reasonable opportunity to
> act on the communication before the bank accepts the payment order.

> (c) After a payment order has been accepted, cancellation or amendment of the
> order is not effective unless the receiving bank agrees or a funds transfer system
> rule allows cancellation or amendment without agreement of the bank.

810 ILCS 5/4A-211(b), (c).

Although consideration of Section 211 is appropriate, consideration of U.C.C. Section

5/4A-209 is also necessary to the interpretation and application of Section 211. Section 209

states in relevant part:

> Acceptance of a payment order.

> (a) . . . a receiving bank other than the beneficiary's bank accepts a payment order
> when it executes the order.

> (b) . . . a beneficiary's bank accepts a payment order at the earliest of the
> following times:

(1) when the bank (i) pays the beneficiary as stated in Section 4A-405(a) or 4A-405(b), or (ii) notifies the beneficiary of receipt of the order or that the account of the beneficiary has been credited with respect to the order unless the notice indicates that the bank is rejecting the order or that funds with respect to the order may not be withdrawn or used until receipt of payment from the sender of the order;

(2) when the bank receives payment of the entire amount of the sender's order pursuant to Section 4A-403(a)(1) or 4A-403(a)(2); or

(3) the opening of the next funds transfer business day of the bank following the payment date of the order, if, at that time, the amount of the sender's order is fully covered by a withdrawable credit balance in an authorized account of the sender or the bank has otherwise received full payment from the sender . . .

810 ILCS 5/4A-209.

Of relevance here, Sections 211(b) and 209 contain terms that are specifically defined in

Sections 5/4A-103 and 104 of the U.C.C. The relevant definitions are as follows:

Section 4A-103. Payment order; definitions.

(a) In this Article:

(1) "Payment order" means an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary . . . .

(2) "Beneficiary" means the person to be paid by the beneficiary bank.

(3) "Beneficiary's bank" means the bank identified in a payment order in which an account of the beneficiary is to be credited pursuant to the order or which otherwise is to make payment to the beneficiary if the order does not provide for payment to an account.

(4) "Receiving bank" means the bank to which the sender's instruction is addressed.

(5) "Sender" means the person giving the instruction to the receiving bank.
. . .

(c) A payment order is issued when it is sent to the receiving bank.

810 ILCS 5/4A-103.

Section 4A-104. Funds transfer; definitions.  In this Article:

(a) "Funds transfer" means the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. . . .

(b) "Intermediary bank" means a receiving bank other than the originator's bank or the beneficiary's bank.

(c) "Originator" means the sender of the first payment order in a funds transfer.

(d) "Originator's bank" means (i) the receiving bank to which the payment order of the originator is issued if the originator is not a bank, or (ii) the originator if the originator is a bank.

810 ILCS 5/4A-104.

The Court respectfully highlights three aspects of these Article 4A provisions.  First, the participants' roles in a funds transfer are not necessarily static.  (*See* D.E. 13 at 11.)  For example, parties may play different roles at different stages of a funds transfer—namely, the same party may be the receiving bank for one payment order and the sender of another payment order.  *See* 810 ILCS 5/4A-104, Official Comment 1, Case # 3 (explaining how in a funds transfer involving multiple payment orders, a bank may be first a "receiving bank" and then a "sender").  Second, participants may play multiple roles simultaneously; for example, a beneficiary bank is also a receiving bank, and a receiving bank also may be an intermediary bank.  *See id.* (stating that in a hypothetical funds transfer, "Bank B" was both a receiving bank and a beneficiary bank and "Bank C" was both a receiving bank and an intermediary bank).  Finally, a payment order is not necessarily a payment—it is a communication from a sender to a bank, instructing that bank to pay another party.  *See* 810 ILCS 5/4A-103.

-17-

c.      Roles Played By The Participants In The Funds Transfer Here

With the relevant U.C.C. provisions and definitions in hand, the Court now turns to the instant case to identify what roles potentially were played by the companies and banks involved in the funds transfer.  (The Court says "potentially" because the factual basis for the oral ruling was unstated as to many issues.)  In this regard, it appears reasonably clear that the intended outcome of the funds transfer was for Griffin Trading, the originator, to make a payment to MeesPierson, the beneficiary.  The funds transfer appears to have been initiated when Griffin Trading (through its agent, Rose) as sender/originator issued a payment order to a receiving bank, *i.e.*, the order sent to London Clearing House to transfer £1.6 million to Bank of Montreal. (*See* J.A. 43, O'Connell Aff. ¶ 50.)  London Clearing House, Bank of Montreal, and Credit Lyonnais seemingly served as intermediary banks (as well as being sending banks and receiving banks) for the funds transfer.  (*See id.*)  MeesPierson's bank appears to have been the beneficiary bank, in addition to being a receiving bank.  (*See id.*)  Given this backdrop for the funds transfer, it appears to the Court that the transfer would have involved a series of five payment orders sent from multiple senders (Griffin Trading, London Clearing House, Bank of Montreal, Credit Lyonnais, and then Bank of Montreal again) to multiple receiving banks (London Clearing House, Bank of Montreal, Credit Lyonnais, Bank of Montreal, and MeesPierson's bank).

d.      It Is Unclear From the Oral Opinion Whether the Trustee Proved That Defendants Could Have Cancelled Payment Orders Sent To And Received By Non-Beneficiary Banks

Returning to the question of whether the funds transfer could have been cancelled under Section 211(b), the Court construes Defendants' brief as raising two primary arguments.  First, relating to the acceptances by the non-beneficiary banks (London Clearing House, Bank of Montreal, and Credit Lyonnais), Defendants argue that the Trustee failed to show that "none of

the banks had 'accepted' within the meaning of section 4A-209," and so did not prove that the funds transfer was cancellable for the entire time period between the order at 11:19 a.m. GMT on December 22 and the wire payment at 11:52 a.m. GMT on December 23. (D.E. 13 at 12 (stating that "[a]s to this question, the record is devoid of any evidence.").) Second, Defendants argue that the Trustee failed to prove that the beneficiary bank, MeesPierson's bank, had not accepted prior to 11:52 a.m. GMT on December 23. (D.E. 13 at 12, D.E. 20 at 11-13.) The Trustee counters by asserting that Defendants had the "legal ability and the authority" to rescind the funds transfer "as a matter of right" for a twenty-four hour period because "from 11:19 a.m. on December 22, 1998 until 11:23 a.m. on December 23, 1998, the $2.9 million (or DM 5 million) was on deposit in bank accounts owned by the Debtor and thus controlled by defendants." (D.E. 14 at 32.)

It is possible that the evidence in the record reflects that the funds transfer, as completed by the various steps, was reversible during the relevant time periods. However, with all respect, the bankruptcy court addressed this factual question in just two sentences, stating that Defendants knew about the wire transfer "while there was still time to stop it," and that "the law allowed the defendants to abort the wire transfer up until the time that the money was actually transferred." (J.A. 45, 1/26/05 Ruling Tr. at 9, 10.) With respect, the brief treatment of this factual question, as evaluated against the rubric of seemingly applicable U.C.C. provisions (one of which was identified in the oral ruling and post-trial reply brief) does not make clear: (1) what was the underlying factual foundation for the bankruptcy court's ruling; or (2) whether that ruling was correct. As a result, the Court remands for clarification of the basis for the oral ruling.

Resolving the issue would appear to be rather complicated. For example, at least on the basis of certain evidence (*see generally, e.g.*, J.A. 43, O'Connell Aff. ¶ 50), one might possibly conclude that London Clearing House and Bank of Montreal, via transfers of funds to Bank of Montreal and Credit Lyonnais respectively, each accepted under Section 209(a) on the morning of December 22.[3] *See* 810 ILCS 5/4A-209; 810 ILCS 5/4A-301(a). If London Clearing House and Bank of Montreal accepted these two payment orders on the morning of December 22, Griffin Trading seemingly (or at least potentially) would have had no unilateral right to cancel the orders. *See* 810 ILCS 5/4A-211(c). Moreover, under a technical reading of Section 211(b), Griffin Trading would have been unable to cancel any payment order except the order that it sent to London Clearing House. *See* 3 White and Summers, *Uniform Commercial Code* § 23-7 at 48-9, Problem #1 (5th ed. 2002) (describing a scenario where the GM, the originator, is attempting cancel a payment order to National City, the beneficiary's bank, that GM did not send, *i.e.*, that was sent by NBD, the receiving bank, subsequent to receiving GM's payment order. The discussion of the scenario states that "only NBD has the right to cancel the payment order to

_____

[3] The Court notes that London Clearing House and Bank of Montreal might have accepted the payment orders prior to these transfers of funds. As stated above, under Section 209, acceptance of a payment order occurs when the receiving bank "executes the order" (810 ILCS 5/4A-209); Section 301(a) explains that "execution" occurs when the receiving bank "issues a payment order intended to carry out" the sender's order. *See* 810 ILCS 5/4A-301(a); *see also* 810 ILCS 5/4A-209, Official Comment 2. Therefore, under the U.C.C., London Clearing House and Bank of Montreal could potentially have accepted via a communication of a payment order before any funds were actually transferred. (*See, e.g.*, D.E. 20 at 12 ("[U]nder Article 4A, or any system of rules for that matter, it was critical to know what the banks communicated to each other and ultimately to MeesPierson—and when.") Similarly, it appears that the record may only include evidence of the latest possible time for acceptance for payment orders received by Credit Lyonnais and Bank of Montreal. That is, although Credit Lyonnais transferred DM 5 million to Bank of Montreal at 11:51 a.m. GMT on December 23, and although Bank of Montreal transferred DM 5 million to MeesPierson's bank at 11:52 a.m. GMT, both Credit Lyonnais and Bank of Montreal could have issued payment orders/communications constituting acceptance prior to those transfers. *See* 810 ILCS 5/4A-209; 810 ILCS 5/4A-301(a).

National City.  (Technically the immediately preceding statement is correct under 4A-211(b)

which authorizes a cancellation as 'effective' only when sent by 'the sender.'  However, in the

case posed we would not be surprised to see a court stretch 4A-211 to give a non-sender, GM,

the power to cancel an unaccepted payment order in the circumstances posed.)").

        In discussing the applicable U.C.C. principles as they may relate to the acceptances by

the non-beneficiary banks, the Court does not ignore the possibility that the bankruptcy court's

ruling was correct, nor the realities of the situation.  The Trustee states, seemingly correctly, that

until 11:52 a.m. GMT on December 23, the $2.9 million remained on deposit in accounts

controlled by Defendants.  (*See* D.E. 14 at 32.)  Therefore, even if Defendants may not have had

a unilateral right under Section 211(b) to cancel all relevant money transfer orders, the banks

involved may have been willing to agree to cancel the orders and thus to halt the funds transfer.

*See* 810 ILCS 5/4A-211(c); *but see id.*, Official Comment 3 ("If the receiving bank has already

executed the sender's order, the bank would not consent to cancellation unless the bank to which

the receiving bank has issued its payment order consents to cancellation of that order.  It makes

no sense to allow cancellation of a payment order unless all subsequent payment orders in the

funds transfer that were issued because of the cancelled payment order are also cancelled.  Under

subsection (c)(1), if a receiving bank consents to cancellation of the payment order after it is

executed, the cancellation is not effective unless the receiving bank also cancels the payment

order issued by the bank."); *id.*, Official Comment 5 ("If the receiving bank has incurred liability

as a result of its acceptance of the sender's order, there are substantial risks in agreeing to

cancellation or amendment.").  In addition, the Trustee points to one piece of testimony (J.A. 44,

Trial Tr. at 130-31), which, if credited, may have been understood to address the questions at

hand.  *See generally Delbrueck & Co. v. Manufacturers Hanover Trust Co.*, 609 F.2d 1047, 1051

(2d Cir. 1979) ("The practices associated with banking transactions can be conclusive evidence of the legal effect of those transactions.").  However, at a minimum, it is unclear, at least as explained in the oral ruling, whether that testimony was understood and accepted as answering all of the relevant complex issues in play in this area of the law.  Finally, in this regard, the Court notes the possibility that the various legal issues noted herein may not have been squarely in focus at trial—again, because the litigants seemingly did not highlight the U.C.C. issues, even in general terms, until the post-trial briefing.  If that was the case, various courses of conduct might be appropriate on remand—potentially reopening evidence on these issues, or perhaps even deeming them waived if the case fairly can be resolved on the evidence and legal principles that actually were squared up by the parties before trial.  However, it seems impossible, with all respect, to incorporate a legal framework identified in the post-trial briefing (namely, U.C.C. Section 5/4A-211(b) (*see* D.E. 13 at 9-10)) as a foundational legal basis for the judgment without then applying the other relevant U.C.C. sections that are seemingly required to follow the issue through under the U.C.C. analysis, and explaining how the evidence at trial justifies the outcome under those sections.  Again, what course of action (*e.g.*, reopening the evidentiary presentation on limited issues, explaining the basis for the ruling in greater detail, invoking waiver principles, and so forth) will best be addressed, at least in the first instance, through the informed discretion of the bankruptcy court.

> e.     There Is An Unresolved Issue As To Whether the Trustee Proved That Defendants Could Have Cancelled The Funds Transfer To The Beneficiary Bank

Moreover and independently, there is an issue—not specifically addressed in the oral ruling—as to when the beneficiary bank, MeesPierson's bank, as opposed to the intermediary

banks discussed above, accepted.[4]  (*See* D.E. 20 at 12.)  The Trustee asserts that acceptance by

MeesPierson's bank did not occur until it received the wire payment from Bank of Montreal at

11:52 a.m. GMT on December 23.  (*See* D.E. 14 at 33.)  At least on the basis of the reasons

given in the oral ruling, however, it is unclear whether there was proof that Defendants could

have cancelled the funds transfer up until Mees Pierson's bank received the wire payment.

As stated above, Section 209(b) is the U.C.C. provision that establishes when a

beneficiary bank has accepted a payment order.  *See* 810 ILCS 5/4A-209(b).  The Trustee claims

that under Section 209(b), "an order is not executed until the beneficiary's bank, *i.e.*,

MeesPierson's bank, receives the money."  (D.E. 14 at 33; *see also id.* at 30 ("Execution of an

order occurs when the funds are transferred to the beneficiary's account, *i.e.* to the account of the

party that is to ultimately receive the funds.").)  Yet this interpretation of Section 209(b), with all

respect, is incomplete.  While receipt of payment of the entire amount of the sender's payment

order is one of the ways a beneficiary's bank may accept a payment order (*see* 810 ILCS 5/4A-

209(b)(2)), the statute lists multiple additional means of acceptance (*see* 810 ILCS 5/4A-

209(b)(1)), and these acceptance possibilities are preceded by the statement that "a beneficiary's

---

[4]  Defendants make another argument that likely merits analysis on remand concerning
whether the funds transfer could have been cancelled at any point during the relevant twenty-
four hour period.  (*See* D.E. 20 at 11 (arguing that "section 211 itself does not necessarily answer
when a wire transfer may be cancelled" because funds transfer systems and banks may set their
own rules for when a wire transfer may be countermanded, apart from the rules under Article 4A
of the U.C.C.)); *see also* 810 ILCS 5/4A-211, Official Comment 8 (stating that "[a] funds
transfer system rule can govern rights and obligations between banks that are parties to payment
orders transmitted over the system even if the rule conflicts with Article 4A"); *id.*, Official
Comment 3 (stating that "a receiving bank will normally have cut-off times for such
communications [relating to cancellation], and the receiving bank is not obliged to act on
communications received after the cut-off hour.").  Given the remand in the case, it is not
necessary to address this issue further herein, but it can be analyzed as against relevant evidence
in the bankruptcy court.

-23-

bank accepts a payment order *at the earliest of the following times*." 810 ILCS 5/4A-209(b) (emphasis added); *see also United States of America v. BCCI Holdings (Luxembourg), S.A.*, 980 F. Supp. 507, 514 & n.9 (D.D.C. 1997) (stating that in that case, the relevant method of acceptance by the beneficiary bank was receipt of payment of the entire amount of the sender's order, but acknowledging that "[t]here are, of course, other ways for a beneficiary bank to accept a payment order . . . ."); *Aleo Int'l, Ltd. v. Citibank, N.A.*, 612 N.Y.S.2d 540, 541 (N.Y. Sup. Ct. 1994) (quoting from U.C.C. Section 209(b): "a beneficiary's bank accepts a payment order at the earliest of the following times: (a) when the bank (i) pays the beneficiary . . . or (ii) notifies the beneficiary of receipt of the order or that the account of the beneficiary has been credited with respect to the order. . . .").

Again, as was the case with the non-beneficiary banks, it is unclear whether the bankruptcy court analyzed this issue or the basis upon which it adjudicated and resolved the factual question if it did so. As discussed above, if Bank of Montreal sent a payment order to Mees Pierson's bank before it sent the wire payment, MeesPierson's bank seemingly could have accepted a payment order from Bank of Montreal pursuant to Section 209(b)(1) by notifying Mees Pierson of its receipt of the order. *See, e.g.*, 3 White and Summers, *Uniform Commercial Code* § 23-7 at 48-50, Problem #1 (describing a scenario where the beneficiary's bank accepted a payment order by notifying the beneficiary prior to receiving full payment from the sender via a settlement system). Put differently, it is unclear from the oral ruling whether the bankruptcy court analyzed whether MeesPierson's bank could have accepted or did accept a payment order prior to the wire payment at 11:53 a.m. on December 23. *See* 810 ILCS 5/4A-209(b). That potentially could have led to a different outcome as to whether Griffin Trading had a right to cancel under Section 211(b), as would be required to prove causation.

For the foregoing reasons, the Court finds that the most prudent course is to remand to the bankruptcy court for analysis of whether the Trustee established revocability under Article 4A of the Illinois U.C.C., which entails a parsing of the evidence as against the various legal sub-issues identified above. In remanding, this Court is mindful of the possibility that the various U.C.C. sub-issues discussed herein were not a central focus of the adversarial clash at trial. If true, that is certainly unfortunate, and this dynamic created special challenges for the bankruptcy court in trying to reach a fair outcome. In any event, a foundational basis for the oral ruling was that it was directed by and was consonant with the U.C.C. Once the bankruptcy court meaningfully rested the propriety of the judgment on the U.C.C. analysis, the sub-issues identified herein were triggered. There are complex legal and factual questions related to the U.C.C. analysis, and this Court has concluded that the fairest outcome—in terms of affording appropriate deference to evidentiary assessments of the bankruptcy court that heard the competing evidentiary claims, and in terms of allowing the bankruptcy court the discretion to assess whether any additional evidentiary presentations are appropriate, etc.—is to let the bankruptcy court address the evidentiary sub-issues identified herein in the first instance. To the extent the parties wish to be heard on the question of reopening the factual record, or wish to advance waiver arguments, they are free to do so in the bankruptcy court, which can resolve them in its informed discretion.

## CONCLUSION

For the reasons stated above, the judgment of the bankruptcy court is vacated, and the

case is remanded to the bankruptcy court for proceedings consistent with this opinion.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois


Date:    _____1/23/08_____